UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ABDULLAH BILAL,                    )
                                   )
            Plaintiff,             )        Case No. C04-2507-JLR-JPD
                                   )
      v.                           )
                                   )        REPORT AND RECOMMENDATION
JOSEPH LEHMAN, et al.,             )
                                   )
            Defendants.            )
_____ )

## I.  INTRODUCTION AND SUMMARY CONCLUSION

Plaintiff Abdullah Bilal is a resident of the Washington State Special Commitment Center ("SCC") for sex offenders who is proceeding through counsel in this 42 U.S.C. § 1983 civil rights action against two groups of defendants:  (1) individuals and entities associated with his now-concluded criminal incarceration at the Washington Department of Corrections' Monroe Correctional Complex ("DOC defendants"); and (2) individuals and entities associated with his present confinement at the SCC ("SCC defendants").  This matter challenges the DOC's prior refusal to provide the plaintiff with Halal meat while he was incarcerated at Monroe.  Although he now receives Halal meat as part of his diet at the SCC, it was not provided until counsel was appointed to represent him in the present lawsuit. Plaintiff believes his diet will be changed to eliminate Halal meat unless he prevails in this lawsuit.  He is seeking monetary, injunctive, and declaratory relief.

REPORT AND RECOMMENDATION
PAGE - 1

01     Before the Court are cross motions for summary judgment.  Having carefully

02 reviewed the parties' pleadings and the record, the Court recommends that the declaratory

03 relief sought against the SCC Defendants under the Religious Land Use and Institutionalized

04 Persons Act (RLUIPA), 42 U.S.C. § 2000cc to 2000cc-5 (Dkt. No. 81), be GRANTED.  The

05 Court further recommends that the DOC and SCC Defendants' motions for summary

06 judgment (Dkt. Nos. 70 and 71) be GRANTED with respect to any monetary claims because

07 the defendants are entitled to qualified immunity.

## II.  FACTS AND PROCEDURAL HISTORY

09     A.  <u>The Plaintiff</u>

10     Plaintiff is a Fiqh Al-Sunnah Muslim.  Dkt. No. 43, ¶ 6.  He believes that "eating meat

11 is an important part of his ability to exercise his religion" and that the Holy Qur'an requires

12 him to eat Halal meat.  Dkt. No. 43, ¶ 14-15.  During the summer of 2004, while incarcerated

13 at the Monroe Correctional Complex ("MCC"), a prison operated by the Washington

14 Department of Corrections, plaintiff repeatedly requested meals that contained Halal meat.

15 Dkt. No. 43, ¶¶ 19-24.

16     There is no dispute that a Halal diet is of religious significance to adherents of Islam.

17 Halal is a term from the Holy Qur'an that means "lawful" or "permitted."  Dkt. No. 88 at 41.

18 On the other hand, food that is prohibited is called "Haram."  *Id.*  Foods that are lawful or

19 "Halal" are defined in the Qur'an, the Hadith (sayings of the prophet Muhammad), and in the

20 jurisprudence of the various Muslim Jurists:  Hanafi, Shafii, Maliki, and Hanball.  *Id.* at 43.

21     Halal meat is that which is slaughtered in accordance with Islamic law.  While Jewish

22 and Islamic law differs concerning what animals may be consumed, as a general proposition,

23 Islamic law allows all of the animals allowed in Jewish law.  Dkt. No. 78, ¶ 8.  According to

24 one religious expert, the majority position in Islamic law is that animals slaughtered by a

25 person from the "People of the Book" are to be considered the equivalent of animals

26 slaughtered by a Muslim butcher.  "People of the Book" include Jews, Christians, and other

REPORT AND RECOMMENDATION
PAGE - 2

01   religious communities.  In practice, many Muslims commonly treat Kosher meat as Halal.

02   Dkt. No. 78, ¶ 11.  However, according to another religious expert, contemporary American

03   Muslims use the term "halal" to designate meat of animals slaughtered by Muslims in

04   accordance with Islamic law.  For these Muslims, Kosher meat would not be deemed to be

05   halal.  Dkt. No. 93, ¶ 4.  Moreover, there is substantial disagreement among Muslim legal

06   scholars on whether animals slaughtered by non-Muslims may be consumed.  Id. ¶ 6.  Indeed,

07   the State acknowledges this as well.  The DOC Handbook of Religious Beliefs and Practices

08   states that Shi'a Muslims are only allowed to eat Halal meats, which do not include Kosher

09   meats or meats not slaughtered in accordance with the Qur'an.  Dkt No. 70-2 at 27.

10       When the plaintiff was confined at the MCC, he was not provided meals that included

11   Halal meat as the plaintiff understood Halal meat—that is, meat from animals slaughtered in

12   the name of Allah.  Instead, after studying the matter, the MCC concluded that providing

13   Kosher meat meals adequately addressed the religious dietary requirements of Muslim

14   inmates.  Between approximately July 7, 2004, and July 21, 2004, Muslims incarcerated at

15   MCC were allowed to receive Kosher meat meals.  Dkt. No. 43, ¶ 19.  After July 21, 2004,

16   however, Muslim inmates were no longer provided meals with Kosher meat.  Instead, they

17   received only ovo-lacto vegetarian meals.  Id. ¶¶ 21-25.  Kosher meals, including Kosher

18   meat, were provided only to Jewish inmates.  Id. ¶ 22.  Plaintiff filed several grievances

19   requesting Kosher or Halal meals, but these grievances were denied.  Id. ¶¶ 21-25.

20       On January 21, 2005, plaintiff filed a *pro se* 42 U.S.C. § 1983 civil rights complaint

21   against the State of Washington, DOC, and several DOC officials.  Id. ¶¶ 6-7.  Plaintiff

22   alleged that his religious beliefs require him to eat meat, and that the DOC defendants

23   violated his First Amendment rights by refusing to provide him with meals that contained

24   Halal meat.  He also alleged that the DOC Defendants' violated the Equal Protection Clause

25   by providing Jewish inmates with meals that contained Kosher meat, while denying Muslim

26   inmates meals that contained Halal meat.  Dkt. No. 6.

REPORT AND RECOMMENDATION
PAGE - 3

01          While plaintiff's case was proceeding, he concluded his sentence at the MCC.  Dkt.

02   No. 43, ¶ 6.  He was then civilly committed to the SCC as a sexually violent predator as

03   defined by R.C.W. 71.09.020(16), and resides there indefinitely.  *Id.* ¶¶ 6, 26.  He alleges that

04   shortly after arriving at the SCC, plaintiff again requested meals with Halal meat, but was told

05   that they were not available.  *Id.* ¶¶ 27-29.  On December 9, 2005, pursuant to his request,

06   plaintiff began receiving Kosher meals.  *Id.* ¶ 31.

07          Counsel was appointed and on March 20, 2006, plaintiff filed a first amended

08   complaint.  Dkt. Nos. 26-27, 43.  On March 16, 2006, in response to a formal request made

09   by the plaintiff about one month earlier, the SCC began serving plaintiff a diet consistent with

10   his religious beliefs, which included Halal meat.  Dkt. No. 54, ¶ 33.  The SCC continues to do

11   so today, although it contends that it has no legal obligation to do so.

12          B.    <u>The Defendants</u>

13          The named defendants in the amended complaint are the State of Washington, as the

14   administrator of the MCC and SCC; Mark Kucza, the Associate Superintendent of the MCC,

15   alleging that he is responsible for implementing policies relating to inmates' religious dietary

16   requests;  Dan Williams, the statewide religious manager for the State Department of

17   Corrections ("DOC"); Henry Richards, the Superintendent of the SCC, and Alan McLaughlin,

18   the Associate Superintendent of the SCC, alleging they are both responsible for implementing

19   policies at the SCC relating to residents' religious dietary requests; and Greg Duncan, the

20   Chaplin at SCC, who is alleged to be responsible for managing and accommodating the

21   religious requirements of the SCC.  Dkt. No. 43, ¶¶ 7-12.  The defendants are represented by

22   two separate counsel, reflecting the different periods of time in which the plaintiff has been in

23   custody, the different State entities responsible for plaintiff's custody, and the differences in

24   how they handled the plaintiff's requests.  This opinion will follow this separation.  For

25   convenience, the reference to DOC Defendants will include the State of Washington as

26   administrator of the MCC Complex, where the plaintiff was imprisoned until he was civilly

REPORT AND RECOMMENDATION
PAGE - 4

01   committed to the Special Commitment Center, and defendants Kucza and Williams.  The

02   reference to SCC Defendants will include the State of Washington as the administrator of the

03   Special Commitment Center, and defendants Richards, McLaughlin, and Duncan.

III.  LEGAL ANALYSIS

05        The primary thrust of the plaintiff's 42 U.S.C. § 1983 claim is that the DOC's failure

06   to provide him with a meal that included Halal meat and his fear that the SCC will refuse to

07   do so in the future, is a violation of RLUIPA, as well as his rights under the First Amendment

08   and the Equal Protection Clause of the Fourteenth Amendment.  The DOC and SCC

09   Defendants claim that the dispute is moot.  They also deny that their policies violate RLUIPA.

10   Both contend that they are entitled to qualified immunity from the plaintiff's suit.  SCC

11   claims RLUIPA is not applicable to it because it does not directly receive any federal funds.

12   Finally, both defendants claim that Eleventh Amendment immunity bars any requested relief.

A.        The Dispute is Not Moot

14        The DOC Defendants have asserted that the present dispute is moot, because the

15   plaintiff has completed his sentence and, because he is confined at the SCC, he is unlikely to

16   be returned.  The SCC Defendants assert that because they now provide the defendant with

17   Halal meat, the dispute is moot, and the RLUIPA "safe harbor" applies.

18        In *Ballen v. City of Redmond*, — F.3d. —, 2006 WL 2640537 (9th Cir. Sept. 15,

19   2006), the court rejected the claim that an amendment of a city ordinance relating to

20   commercial speech in response to the decision by the district court rendered the dispute moot.

21   The City acknowledged that the amended ordinance was adopted only as an interim regulation

22   in response to the district court's summary judgment ruling.  *Id.* at *2.  The court rejected the

23   mootness argument because the plaintiff sought damages for past conduct, and a threat to re-

24   enact the old ordinance if the City received a favorable outcome on appeal existed.  *Id.*

25        Similar to *Ballen*, the plaintiff is seeking damages from the DOC Defendants for its

26   failure to honor his religious dietary request.  Dkt. No. 43 at 9.  This means the dispute is not

REPORT AND RECOMMENDATION
PAGE - 5

01  moot as to the DOC Defendants.

02      The plaintiff is also seeking damages from the SCC for its alleged delay in providing

03  him with a diet containing Halal meat.  *Id.*  The SCC Defendants claim that because they are

04  now providing him with a diet containing Halal meat, the case is both moot and subject to the

05  RLUIPA "safe harbor" provisions contained in 42 U.S.C. § 2000cc-1(a), which provides:

06          A government may avoid the preemptive force of any provision of this chapter
            by changing the policy or practice that results in a substantial burden on
07          religious exercise, by retaining the policy or policy and exempting the
            substantially burdened religious exercise, by providing exemptions from the
08          policy or practice from applications that substantially burden religious
            exercise, or by any other means that eliminates the substantial burden.
09

10  The SCC Defendants cite *Civil Liberties for Urban Believers v. Chicago*, 342 F.3d 752 (7th

11  Cir. 2003), *cert. denied*, 541 U.S. 1096 (2004), to support its proposition that the current

12  provision of a Halal meat diet to the plaintiff ends the RLUIPA inquiry.  However, in *Civil*

13  *Liberties*, the court was dealing with a legal change to a zoning ordinance that ensured

14  compliance with RULIPA.  The court held that this zoning change "removed 'any potential

15  substantial burden' on religious exercise."  *Id.* at 759, 762.  This safe harbor would preclude

16  any claim for damages under RLUIPA against the SCC Defendants for the delay in

17  implementing the Halal meat diet plan.  *Boles v. Neet*, 402 F. Supp. 2d 1237 (D. Colo. 2005).

18      However, this does not end the inquiry as to non-monetary relief against the SCC

19  Defendants.  The SCC Defendants have made it clear that they have not "removed any

20  potential substantial burden on religious exercise" in this case.  Indeed, unlike *Civil Liberties*

21  and *Boles*, there has been no change in the SCC's policy.  Instead, the SCC Defendants

22  continue to deny that they have an obligation to provide him with a Halal meat diet.  Dkt. No.

23  82, Ex. 3, at 27 (Richards Dep.); Dkt. No. 94-1 at 3, 4 (" No right exists to a religious diet

24  including halal meat"; "plaintiff simply has no right to a religious diet that includes Halal

25  meat").  The SCC is apparently providing a Halal meat diet to the plaintiff as a courtesy.

26  However, just as courtesies can be provided, they can be withdrawn.  Indeed, defendant

REPORT AND RECOMMENDATION
PAGE - 6

01    Duncan, the SCC chaplain, stated that he believed he could withdraw the Halal meat diet from

02    the plaintiff if the plaintiff consumes or orders food from the SCC store that the chaplain

03    believes is inconsistent with a Halal diet.  He also testified that the plaintiff should have been

04    suspended from receiving a Halal meat diet for a sixty-day period, because he heard from a

05    cook that the plaintiff consumed one meal from the mainline diet.  Dkt. 82, Ex. 4, at 72.  It

06    can hardly be said that a voluntary provision of Halal meat by the SCC Defendants who

07    continue to deny vehemently that they have any obligation to do so, removes "any potential

08    substantial burden" on the plaintiff's exercise of religion.  The suit against the SCC

09    Defendants is suit is neither moot nor precluded by 42 U.S.C. § 2000cc1-a.

10          B.    <u>Section 1983 and Qualified Immunity</u>

11         42 U.S.C. §1983 provides a cause of action against persons acting under color of state

12    law who have violated rights guaranteed by the Constitution or federal statutes.  *Buckley v.*

13    *City of Redding*, 66 F.3d 188, 190 (9th Cir. 1995).  Plaintiff claims his civil rights guaranteed

14    by RLUIPA and the First and Fourteenth Amendments have been violated by the State's

15    failures to provide him with a diet containing Halal meat, consistent with his sincerely held

16    religious beliefs.

17         The State Defendants have asserted a qualified immunity defense.  A public official who

18    performs a discretionary function enjoys qualified immunity in a civil action for damages,

19    provided that his or her conduct does not violate clearly established federal statutory or

20    constitutional rights of which a reasonable person would have known.  *Harlow v. Fitzgerald*,

21    457 U.S. 800, 818 (1982).  Thus, qualified immunity "provides ample protection to all but the

22    plainly incompetent or those who knowingly violate the law." *Burns v. Reed*, 500 U.S. 478,

23    480 (1991).

24         The Supreme Court established a two-part test for determining whether an official is

25    entitled to qualified immunity.  First, the Court must determine whether the facts, when taken

26    in the light most favorable to the plaintiff, demonstrate that the defendant's conduct violated a

01  constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Cruz v. Kauai County*, 279

02  F.3d 1064, 1068-69 (9th Cir. 2002); *Boyd v. Benton County*, 374 F.3d 773, 778 (9th Cir.

03  2004). Then, if a violation is articulated, the Court must ascertain whether the constitutional

04  right at issue was "clearly established" at the time of the alleged violation. *Saucier*, 533 U.S. at

05  201; *Cruz*, 279 F.3d at 1069.

06      Utilizing the *Saucier* two-step analysis, the Court turns initially to whether the conduct

07  of the DOC and SCC violated plaintiff's rights under RLUIPA and the Fourteenth

08  Amendment.

09      C.    The Policy of Denying Plaintiff a Diet Containing Halal Meat Violates the
                Religious Land Use and Institutionalized Persons Act

10

11      The Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §

12  2000cc to 2000cc-5, provides, in relevant part, that "no government shall impose a substantial

13  burden on the religious exercise of a person residing in or confined to an institution," unless the

14  burden "is in furtherance of a compelling governmental interest" and "is the least restrictive

15  means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a).

16  RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by,

17  or central to, a system of religious belief." *Id.* § 2000cc-5(7)(A).

18      RLUIPA was passed in 2000 to "protect[ ] institutionalized persons who are unable

19  freely to attend to their religious needs and are therefore dependent on the government's

20  permission and accommodation for exercise of their religion." *Cutter v. Wilkinson*, 544 U.S.

21  709, 710 (2005); *see also* 139 CONG. REC. S14466-01, 1993 WL 434847 (daily ed. Oct. 27,

22  1993) (statement of Sen. Dole) ("[I]f religion can help just a handful of prison inmates get back

23  on track, then the inconvenience of accommodating their religious beliefs is a very small price

24  to pay.") (addressing the Religious Freedom Restoration Act, predecessor to RLUIPA). To

25  serve this end, Congress has demanded that the courts construe RLUIPA "in favor of a broad

26  protection of religious exercise, to the maximum extent permitted by the terms of this chapter

REPORT AND RECOMMENDATION
PAGE - 8

01  and the Constitution." 42 U.S.C. § 2000cc-3(g). In addition, RLUIPA appears to have been

02  crafted to address the precise issue in dispute in this case. As a unanimous Supreme Court

03  noted, before enacting the bill, "Congress documented, in hearings spanning three years, that

04  'frivolous or arbitrary' barriers impeded institutionalized persons' religious exercise." *Cutter*,

05  544 U.S. at 716. One of the "frivolous or arbitrary" practices specifically cited by the Court

06  that apparently motivated Congress to pass RLUIPA was "[a] state prison [refusing] to

07  provide Moslems with Hallal food, even though it provided Kosher food." *Cutter*, 544 U.S. at

08  717 n.5 (quoting *Hearing on Protecting Religious Freedom After* Boerne v. Flores*, before the*

09  *Subcommittee on the Constitution of the House Committee on the Judiciary*, 105th Cong., 2d

10  Sess., pt. 3, p. 11 n.1 (1998)).

11        *Cutter* also recognized that courts were to accord "due deference to the experience and

12  expertise of prison and jail administrators." *Id.* This case, then, asks whether one of the

13  "frivolous or arbitrary" practices cited by Congress when passing RLUIPA is outweighed by

14  the deference owed to the prison administrators.

15        As a preliminary matter, the Court recognizes that several courts have found that a

16  state prison's denial of a Halal meat diet to Muslim inmates does not violate RLUIPA. *See*

17  *Phipps v. Morgan*, 2006 WL 543896 (E.D. Wash. Mar. 6, 2006), *Spruel v. Clarke*, 2006 WL

18  1328854 (W.D. Wash. May 12, 2006), *Boyd v. Lehman*, 2006 WL 1442201 (W.D. Wash. May

19  19, 2006). However, this Court is not bound by these district court decisions. *See Starbuck v.*

20  *City and County of San Francisco*, 556 F.2d 450, 457 n.13 (9th Cir. 1977) ("The doctrine of

21  *stare decisis* does not compel one district court judge to follow the decision of another."). In

22  addition, each of these cases involved a *pro se* plaintiff. For this reason and due to the

23  significance of the issue involved, counsel was appointed in this case. Dkt. No. 27. This Court

24  has had the benefit of discovery on the concerns raised by the State and extensive briefing on

25  this issues, which none of the prior reviewing courts has had. This briefing has proved helpful

26  to the Court.

REPORT AND RECOMMENDATION
PAGE - 9

01
02

      1.     *Plaintiff Has Established that the Policy of Denying Him Halal Meat Imposes a Substantial Burden on the Exercise of His Religious Beliefs*

03           To establish a prima facie claim under RLUIPA, plaintiff must prove that defendants'

04  conduct substantially burdened the exercise of his religious beliefs. *See Warsoldier v.*

05  *Woodfern*, 418 F.3d 989, 994-95 (9th Cir. 2005) (citing 42 U.S.C. § 2000cc-2(b)).  While

06  RLUIPA does not define "substantial burden," the Ninth Circuit has held that "a 'substantial

07  burden' on 'religious exercise' must impose a significantly great restriction or onus upon such

08  exercise." *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1027, 1034 (9th Cir.

09  2004).  The burdened religious exercise need not be central to, or compelled by, a system of

10  religious belief.  42 U.S.C. § 2000cc-5(7)(A).  Rather, it need only be a sincerely held religious

11  belief. *See Cutter*, 544 U.S. at 725 n.13; *see also Williams v. Bitner*, 359 F. Supp. 2d 370, 376

12  (M.D. Pa. 2005) ("[F]or purposes of the RLUIPA, it matters not whether the inmate's

13  religious belief is shared by ten or tens of millions.  All that matters is whether the inmate is

14  sincere in his or her own views."), *aff'd in part*, *remanded in part on other grounds by* 455

15  F.3d 186 (3d Cir. 2006).

16           There are two critical issues that are not in dispute.  First, the DOC and the SCC

17  Defendants have provided the plaintiff with a Halal meal.  However, before March 16, 2006,

18  the State Defendants did not include Halal meat as part of that meal.  Second, the sincerity of

19  plaintiff's belief that his religion requires him to maintain a Halal meat diet is undisputed.  All

20  defendants testified that his beliefs regarding the necessity of Halal meat were sincere or that

21  they did not question the sincerity of his belief. *See* Dkt. No. 70-1 at 14 ("[DOC] Defendants

22  do not contest that Plaintiff's beliefs are sincerely held."); Dkt. 82-3 at 14, 42.  Furthermore,

23  while defendants argue that consuming Halal meat is not required by Islamic law, they do not

24  cast doubt on the sincerity of plaintiff's interpretation of Islam.  Accordingly, the Court finds

25  that plaintiff's religious belief that he must maintain a Halal meat diet is sincere.

26           Defendants do dispute, however, plaintiff's claim that failure to provide him with Halal

REPORT AND RECOMMENDATION
PAGE - 10

01  meat substantially burdened his religious exercise.  In doing so, the DOC and SCC rely upon a

02  recent report and recommendation by Magistrate Judge Theiler, which held that a state prison's

03  refusal to provide a Muslim inmate with a Halal meat diet in circumstances nearly identical to

04  the instant case was not a substantial burden on the inmate's religious exercise.[1]  *See Boyd*,

05  2006 WL 1442201 at *10.  Judge Theiler stated:

> The ovo-lacto vegetarian diet which is provided to plaintiff does not require him
> to eat foods which are forbidden by his religion, it simply denies him one
> component of the diet which he contends should be provided.  These facts
> simply do not satisfy this Court that the denial of halal meat constitutes a
> *substantial* burden on the exercise of his religious beliefs.  This is particularly so
> given that defendants make a significant effort to provide Muslim inmates such
> as plaintiff a variety of other ways in which to exercise their religious beliefs as
> well.

*Id.*

12       The Court respectfully disagrees with Judge Theiler's conclusion.  In this case, the

13  parties disagree on the fundamental question of whether the plaintiff's exercise of religion is

14  impaired by failure to provide him with Halal meat.  Religious scholars also differ on whether

15  Halal meat is a religious dietary requirement.  For example, the defendants supplied a

16  declaration from Dr. Wheeler, a religious scholar, indicating that consumption of meat is not

17  required by Islamic law, and that vegetarianism sets an example of religious piety.  He noted:

> The Quran does not specifically address the issue of vegetarianism, but a
> number of Muslim sources commenting on the Quran explain that the greatest
> prophets and early exemplars of religious piety consumed a meat-free,
> vegetarian diet.  In part, the special piety exhibited by a vegetarian diet derives

---

[1]   The SCC also cites *Phipps*, 2006 WL 543896, and *Watkins v. Shabazz*, 2006 WL
1381627 (9th Cir. May 22, 2006), for this proposition.  *Phipps*, however, found that denying
an inmate a Halal meat diet *was* a substantial burden.  It denied relief because the court found
that it was reasonable under the *Turner* analysis, discussed further below.  *Phipps*, 2006 WL
543896 at *9.  *Watkins*, in addition to being an unpublished case that may not be cited for
precedential value, *see* Ninth Circuit Rule 36-3, held that denying an inmate a Halal meat diet
was not a substantial burden when an inmate was given the choice to *either* be given a
nutritionally equivalent diet *or* find an outside religious organization to contract with the
prison to provide Halal meat.  *Watkins*, 2006 WL 1381627 at *1.  Plaintiff in the instant case
was not given the option to contact a vendor to provide Halal meat, and for that reason,
*Watkins* is distinguishable.

REPORT AND RECOMMENDATION
PAGE - 11

01   from the utopian living conditions of Adam and Eve in the garden of Eden
     where there was not eating or meat, nor where there any domesticated animals.
02   Muslim exegesis and history specifically mentions vegetarianism as an important
     aspect of the piety exhibited by famous prophets, and the eating of meat is
03   regarded as a temporary allowance to accommodate the sinful, fallen nature of
     humanity. . . .   Nowhere does the Quran state that a vegetarian diet is not
04   allowed in Islam.

05       In summary, Islamic law does not require the eating of meat as a
     condition of being a Muslim, and the consumption of a vegetarian diet is
06   considered more pious that the eating of a meat diet.

07 Dkt. No. 70-2 at 42, ¶¶ 8-9.

08       On the other hand, the plaintiff has supplied the Court with a declaration from Dr.

09 Zysow, a religious scholar, who disagrees with Dr. Wheeler.  He states:

10       In the present case, it is clear from the Qur'an and hadith, the two
     leading sources of Islamic teaching in all areas, that the Prophet Muhammad and
11   his immediate followers were not vegetarians.  Qur'an 33:21 states that
     Muhammad is a "fitting model (uswa hasana) for you."  For mainstream
12   Muslims, the example set by Muhammad supersedes that of all earlier prophets
     without exception.

13

14       Vegetarianism is a permitted option according to Islamic law. . . .   As a
     fatwa of the Sudi Arabian legal scholar Muhammad Salih al-Munajjid notes, a
15   Muslim must not adopt vegetarianism as a path superior to that of the average
     meat-eating Muslim.  To so regard it would be to reject the example of the
16   perfect life set by the Prophet Muhammad, who consumed meat.  This ruling is
     fully consistent with a report in the standard Sunni collection of al-Nasa'i (d.
17   915), according to which the Prophet Muhammad condemned various ascetic
     practices on the part of his followers, including an undertaking by one man to
18   abstain from meat, as not part of his path (sunna), that is, as un-Islamic. . . .
     From the context of this report, corroborated by the accompanying traditional
19   interpretation, *what is un-Islamic is the adoption of vegetarianism as an
     alternate system to mainstream Islam.*

20

21 Dkt. No. 93, ¶¶ 12-13 (emphasis added).

22       In 2002, the Muslim advisor to the State Department of Corrections was asked whether

23 Halal meat, vegetarian food, or a non-pork meat diet should be provided to Muslim inmates.

24 He responded:

25       [T]hose sincere, practicing Muslims who request halal meat should have
     it served to them.  If the halal meat is provided[,] no vegetarian diets are
26   required.  I am sure you know that in the Orthodox Jewish tradition, Kosher

REPORT AND RECOMMENDATION
PAGE - 12

01
02
03
04
05

food is required and we cannot legitimately stop providing it just because it is cost prohibitive.  It is very hard to give a judicial rule in the Islamic tradition based on cost factors, because what is permissible and not permissible is a religious injunction ordained by the divine being.  The overwhelming majority of Muslims in the Seattle area nowadays consume halal meat.  I came to know recently that there is a large professional Muslim slaughterhouse in the Kent area that may provide halal meat for all DOC prisons.  The meat could be obtained at a discount rate.  This may help average the cost to the DOC.

06
07
08
09

I have talked with several Muslim leaders who are familiar with the problems and difficulties in the various prisons.  No one could agree to sign an injunction or even advise sincerely practicing Muslims that halal meat is not required or that he should accept to consume a non-pork diet.  It is therefore only reasonable to conclude that halal meat should be provided to all the Muslim inmates, and it should be the standard diet.

10  Dkt. No. 82-2, Ex. 3, at 56-57.

11       In July 2005, shortly after the Supreme Court issued its decision in *Cutter*, which

12  highlighted "[a] state prison [refusing] to provide Moslems with Hallal food, even though it

13  provided Kosher food," as one of the "frivolous or arbitrary" practices that Congress meant to

14  address by RLUIPA, defendant Duncan, the SCC chaplain, advised the SCC Food Program

15  Manager that consumption of Halal meat was normal regular practice of those practicing the

16  Muslim faith, and is eaten by Muslims who are not incarcerated.  Dkt. No. 82-3 at 27.

17       The State Defendants deny that Halal meat is a required part of a religiously

18  appropriate Halal diet.  The plaintiff claims that it is an integral part of his religious beliefs.

19  However, this Court is not required to, and indeed, should not endeavor to resolve whether or

20  not Halal meat is actually required by believers of Islam.  As the Supreme Court held in

21  *Thomas v. Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707, 713 (1981), "[i]t

22  is inappropriate for this Court to make a finding regarding what Islam requires, or does not

23  require. . . .  Federal courts do not sit as 'arbiters of religious orthodoxy.'"  Instead, "for

24  purposes of RLUIPA, it matters not whether the inmate's religious belief is shared by tens or

25  tens of millions.  All that matters is whether the inmate is sincere in his or her own views."

26  *Williams v. Bitner*, 359 F. Supp. 2d 370, 375-76 (M.D. Pa. 2005).

REPORT AND RECOMMENDATION
PAGE - 13

01          As discussed above, there is no dispute about the sincerity of the plaintiff's views that

02   Halal meat is a required part of his diet.  There is also religious support for his views.  As a

03   result, the fact that some other practicing Muslims do not share his belief as part of their view

04   of Islam is not relevant to the issue of whether deprivation of Halal meat substantially burdens

05   the plaintiff's exercise of religion.  Thus, the fact that the DOC Defendants provided plaintiff

06   with ovo-lacto vegetarian or Halal meals for a short period of time is irrelevant.  It is

07   undisputed that, with the exception of religious holidays, the DOC did not provide plaintiff

08   with a Halal meat diet.  Dkt. No. 87, Ex. 15.  It is also undisputed that, while the SCC

09   currently provides plaintiff with a Halal meat diet, they failed to do so from his arrival in June

10   2005 until March 2006 (Dkt. No. 77-1 at 7-8), and they maintain that they are not legally

11   required to continue to do so.  Failing to provide plaintiff a Halal meat diet is certainly a

12   "significantly great restriction or onus" on the exercise of his religious belief that he must

13   consume a Halal meat diet.  Accordingly, the Court finds that denying the plaintiff a Halal

14   meat diet substantially burdens the exercise of his sincerely held religious belief.[2]

15                    2.      *The State's Allegations of a Compelling Burden*
                              *Justifying the Denial of Halal Meat Do Not Survive the*
16                            *Required Strict Scrutiny Analysis*

17          Once a plaintiff has established a prima facie case under RLUIPA, the burden shifts to

18   the defendants to prove that the challenged conduct "is in furtherance of a compelling

19   governmental interest" and "is the least restrictive means of furthering that compelling

20   governmental interest."  *See* 42 U.S.C. § 2000cc-1(a); 42 U.S.C. § 2000cc-2(b).

21          As an initial matter, the burden is discussed only by the DOC Defendants.  The SCC

22   Defendants do not contend that there are any burdens at all associated with meeting the

23   plaintiff's religious dietary needs, including the provision of Halal meat.  As to the DOC

24   _____

25          [2]     The Court notes that in *Phipps*, 2006 WL 543896, cited by both the DOC and SCC,
        Magistrate Judge Leavitt also concluded that a state prison's failure to provide a Halal meat
26   diet to an inmate in similar circumstances constituted a substantial burden on religious
        exercise.  *Id.* at * 7.  However, in *Phipps*, the court denied relief, concluding that the State had
        satisfied the "compelling governmental interest" burden.  *Id.* at *9.

REPORT AND RECOMMENDATION
PAGE - 14

01  Defendants, the DOC failed to provide any evidence that it even examined the impact of

02  providing plaintiff with a Halal meat diet until *after* the filing of this suit.  *See* Dkt. No. 88,

03  Ex. 18, 20, 21 (revealing that the DOC did not seek estimates of costs of Halal meat diets

04  until after suit was filed); *Warsoldier*, 418 F.3d at 999 ("[The government] cannot meet its

05  burden to prove least restrictive means unless it demonstrates that it has actually considered

06  and rejected the efficacy of less restrictive measures before adopting the challenged

07  practice.").   However, even if the interests set forth by the DOC had been analyzed prior to

08  the challenged conduct, they do not survive a strict scrutiny analysis.

09         The DOC Defendants raise three burdens that they allege constitute "compelling

10  governmental interests" that justified denial of a Halal meat diet:  (1) reducing costs; (2)

11  efficiencies due to streamlining food production, limiting the number of required staff, and

12  maintaining consolidation of vendors; and (3) limiting security risks.  These interests are the

13  same that Judge Leavitt found to be compelling in *Phipps*, 2006 WL 543896, *9, cited by

14  defendants.  *Phipps* held that a state prison's refusal to provide a Muslim inmate with Halal

15  meat in circumstances nearly identical to the instant case did not violate RLUIPA because it

16  was the least restrictive means of furthering the compelling governmental interests cited

17  above. *Id.*

18         Although these interests were found to be legitimate, *id.* at *7, no authority was cited

19  for the conclusion that these interests were compelling, or for the conclusion that denying the

20  plaintiff a Halal meat diet in that case was the least restrictive means of furthering those

21  interests.  The Court respectfully disagrees with this conclusion.  Moreover, the evidentiary

22  record in this case does not yield the same factual finding.

23         There is no doubt that interests cited by the DOC can be compelling in certain

24  contexts.  *See Cutter*, 544 U.S. at 723 ("[Congress] anticipated that courts would apply the

25  Act's standard with 'due deference to the experience and expertise of prison and jail

26  administrators in establishing necessary regulations and procedures to maintain good order,

security and discipline, consistent with consideration of costs and limited resources.'")
(quoting Joint Statement S7775).  However, strict scrutiny "is the most demanding test known
to constitutional law," *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997), and to allow
government conduct to survive strict scrutiny each time the government claims that
accommodating an inmate's religion would impose some cost or inefficiency, would be to
impermissibly weaken RLUIPA's effect.  *See Madison v. Riter*, 240 F. Supp. 2d 566, 578
n.10 (W.D. Va. 2003) ("Some courts, in examining prison regulations under . . . RLUIPA,
have softened the compelling interest test to allow speculative administrative judgments
concerning security and cost to suffice to allow the regulation to survive strict scrutiny. . . .
Such an approach . . . leaves little of substance to the congressional vision of RLUIPA."),
*rev'd on other grounds*, 355 F.3d 310 (4th Cir. 2003), *cert. denied*, 125 S. Ct. 2536 (2005).
With this analytical framework in mind, the Court must address the three justifications
offered by the DOC.

a.    *Costs*

In *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972), the Supreme Court defined a
compelling interest as "only those interests of the highest order."  In *Memorial Hospital v.
Maricopa County,* 415 U.S. 250, 263 (1974), the Court held that "conservation of the
taxpayers' purse is simply not a sufficient state interest" to withstand strict scrutiny.  While
some courts have held that limiting costs can be a compelling interest, limiting minimal
marginal costs is not.  *See Luckette v. Lewis*, 883 F. Supp. 471, 480 (D. Ariz. 1995)
(recognizing that limiting costs is a compelling interest, but holding that the additional
expense of providing Kosher meals to inmates was not a compelling interest because it was
"minimal"); *see also Agrawal v. Briley*, 2004 WL 1977581, *8 (N.D. Ill. 2004) ("It is
undeniable that, in the abstract, safety, security, internal order and discipline, and the
management and conservation of resources are 'compelling interests.'  It does not follow,
however, that anything that furthers one or more of these interests, however marginally, is

01   equally 'compelling.' . . . [W]hile Illinois undeniably has a compelling interest in conserving

02   its economic resources, the possibility that Plaintiff's preferred diet cost a small amount more

03   per year could not be considered compelling.").

04        This Court does not need to make a determination as to whether increased costs alone

05   would constitute a "compelling governmental interest" for RLUIPA purposes, because the

06   cost claim in this case is not supported by the evidentiary record.  Counsel was appointed for

07   the plaintiff, and as a result of discovery conducted by plaintiff's counsel, the DOC's claims

08   of cost burden have been illuminated.  For DOC inmates, the state estimated that the per day

09   cost of a "mainline" diet was $6.03, and provision of a Kosher diet cost $12.00.  The DOC

10   estimated that the per day cost of a Halal diet would be $6.91.  Dkt. No. 88, Ex. 18.  The

11   Court finds the additional cost of providing plaintiff a Halal meat diet too small to be

12   compelling, especially in light of the fact that Halal meals are substantially less expensive

13   than Kosher meals, which are provided to Jewish inmates.

14                          b.    *Efficiency*

15        The DOC alleges that providing Halal meals would "decrease efficiency of the food

16   preparation" and "necessitate hiring additional staff members."  Dkt. No. 70-1 at 20.  The

17   only evidence offered in support of this claim is the declaration of John Holeman,

18   Consolidated Food Program Manager at the Monroe Correctional Complex.  In his

19   declaration, Holeman states:

20        In 2002, the mainline diet was made pork-free, and the 14 different diet plans
         were consolidated into six that effectively met the religious and medical needs
21        of all inmates.  This change permitted DOC to eliminate 14 FTEs due to the
         simplification of the food preparation.
22        . . . .

23        All special meals create increased demands on staff.  Preparing a few meals for a few
         inmates is typically as labor intensive as preparing and distributing food in large
24        quantities.  Provision of halal meat diets to Muslim inmates would . . . decrease
         efficiency of the food preparation, and necessitate hiring additional staff members.

25

26   Dkt. No. 70-2, Ex. 4.

REPORT AND RECOMMENDATION
PAGE - 17

01        Even if Mr. Holeman's opinion regarding the effect of providing Halal meat diets is

02  accurate, it merely establishes an obvious fact—that providing Halal meat diets to inmates

03  would burden defendants in some way.  Defendants, however, are required to establish that

04  avoiding the burden they would incur if they provided such meals amounts to a compelling

05  interest.  Conclusory statements filed by a summary judgment nonmovant are insufficient to

06  avert that judgment under Rule 56.  *F.T.C. v. Publishing Clearing House, Inc.*, 104 F.3d

07  1168, 1171 (9th Cir. 1997).  The DOC Defendants have offered no evidence to show that the

08  burden on their efficiency would be compelling, as they have not described the nature or

09  extent of any decrease in efficiency, or shown that the number of additional staff would be a

10  compelling burden.  There is no indication, for example, that the burden of providing Halal

11  meat diets would be any greater than that incurred by providing Kosher diets, which

12  defendants already provide.  In addition, the declaration of Paul Temposky, the SCC's Food

13  Program Manager, outlines in great detail the steps the SCC took in procuring and preparing

14  Halal meat diets for SCC residents without any mention of the need to hire additional staff or

15  any material impact on the efficiency of food preparation.  Dkt. No. 77-1.  Accordingly, the

16  Court finds that the DOC has not sustained its burden to establish that any theoretical loss of

17  efficiency caused by providing plaintiff a Halal meat diet amounts to a compelling interest.

18                          c.    *Security*

19        The DOC also contends that denying plaintiff a Halal meat diet furthers a compelling

20  interest in security.  There can be no dispute that valid security concerns are "compelling

21  governmental interests."  *May v. Baldwin*, 109 F.3d 557, 563 (9th Cir. 1997).  In making this

22  claim, however, the DOC again relies solely on Mr. Holeman's declaration, which states "if

23  halal meats were not available through the primary vendor, there are security risks with

24  special delivery services as other providers have not been screened by DOC."  Dkt. No. 70-2,

25  Ex. 4.  Even if Mr. Holeman's opinion is accurate, it still fails to establish that denying

26  plaintiff Halal meat diets implicate compelling security interests, because it fails to describe

REPORT AND RECOMMENDATION
PAGE - 18

the nature and extent of such risks.  Furthermore, DOC Defendants have failed to establish that denying Halal meat diets to inmates is the least restrictive means of furthering that interest, because they have not established why they could not eliminate those risks through adequate screening methods, such as utilizing the screening methods employed by the SCC prior to procuring Halal meat diets from outside vendors.  Dkt. No. 77-1 at 8 (The SCC "screened prospective vendors to ensure their products and methods do not create unacceptable security risks.").

Finally, Mr. Holeman's statement is a conditional statement that does not actually state that providing Halal meat would cause security risks.  Rather, it states that these risks would materialize *if* Halal meats were not available from a current vendor.  Defendants state that "it is not known whether DOC's current vendor provides Halal meats[.]"  Dkt. No. 70-1 at 16-17.  However, there is evidence that Halal meat is available from the primary vendor for the State, as well as from two additional vendors already secured and screened by the SCC.  Dkt. No. 88, Ex. 20 (stating that Halal chicken is available from Food Services of America); Dkt. No. 86, Ex. 10 at 23:6-11 (stating that Food Services of America is the "prime vendor" for the State); Dkt. 77-1 (stating that the SCC contracts with two Halal meat providers that the SCC screened "to ensure their products and methods do not create unacceptable security risks").  Thus, defendants have not provided any evidence that Mr. Holeman's conditional statement regarding security risks even applies.  Accordingly, the Court finds that denying plaintiff a Halal meat diet does not further any compelling security interest.

d.    *Least Restrictive Means*

The DOC Defendants argue that the interests described above relate to a legitimate penological goal, thereby immunizing its conduct, citing *Turner v. Safley*, 482 U.S. 78 (1987).  They contend that under *Turner*, the Court should consider the following four factors in applying a rational relationship test:  (1) the existence of a valid, rational connection between the regulation and the legitimate governmental interest put forward to justify it; (2)

REPORT AND RECOMMENDATION
PAGE - 19

01  the existence of an alternative means of exercising the right that remains open to the prisoner;

02  (3) the impact that accommodation of the asserted constitutional right will have on guards,

03  inmates, and the allocation of prison resources; and (4) the absence of ready alternatives that

04  fully accommodate the inmates' right at a *de minimis* cost to valid penological objectives. *Id.*

05  at 89-91; *see* Dkt. No. 70-1 at 16.

06      The *Turner* analysis has been adopted by courts finding that the failure to provide

07  Halal meat is not a violation of RLUIPA.  However, this Court respectfully disagrees that

08  *Turner* provides the appropriate analytical framework within which to consider the issue

09  posed. When Congress passed RLUIPA, it replaced the *Turner* rational basis standard of

10  review with a strict scrutiny standard.  In *Warsoldier*, the Ninth Circuit explained:

11          In upholding [RLUIPA], the Court recognized RLUIPA "[a]s the latest
        of long-running congressional efforts to accord religious exercise heightened

12      protection from government-imposed burdens,". . . and that Congress sought to
        provide inmates a mechanism to seek redress against "frivolous or arbitrary

13      barriers impeded institutionalized persons' religious exercise." . . .  Congress
        did this by replacing the "legitimate penological interest" standard articulated

14      in *Turner* . . ., with the "compelling governmental interest and "least restrictive
        means" test codified at 42 U.S.C. § 2000cc-1(a).

15

16  *Id.* at 994.

17      Thus, even if denying plaintiff a Halal meat diet furthered some compelling

18  governmental interest, which the Court has found it does not, defendants would still need to

19  establish that it "is the least restrictive means of furthering that compelling governmental

20  interest" in order to survive strict scrutiny.  *See* 42 U.S.C. § 2000cc-1(a).  "[T]he failure of a

21  defendant to explain why another institution with the same compelling interests was able to

22  accommodate the same religious practices may constitute a failure to establish that the

23  defendant was using the least restrictive means." *Warsoldier*, 418 F.3d at 1000.  In addition,

24  the fact that a defendant's compelling interests apply equally to two different groups of

25  inmates, yet the defendant only burdens the religious exercise one of those groups, also

26  suggests that the burden is not the least restrictive means to further those compelling interests.

REPORT AND RECOMMENDATION
PAGE - 20

01   *See id.*

02   The SCC has been providing plaintiff with a Halal meat diet since March 2006.  Dkt.

03   No. 77-1 at 8.  The SCC presumably has the same interests as the DOC in reducing costs,

04   streamlining food production, limiting the number of required staff, maintaining consolidation

05   of vendors, and limiting security risks.  The DOC Defendants' failure to explain why the SCC

06   can provide the plaintiff with Halal meat diets while the DOC cannot is strong evidence that

07   denying plaintiff a Halal meat diet is not the least restrictive means to serve those interests.

08   *See Warsoldier*, 418 F.3d at 1000.  Similarly, the DOC Defendants provide Kosher meat diets

09   to Jewish inmates while denying Halal meat diets to Muslim inmates.  Dkt. No. 70-2, Ex. 4.

10   The same interests apply to both Halal and Kosher meat diets, yet the DOC gives no

11   explanation related to their allegedly compelling interests for the different treatment, which is

12   also strong evidence that denying plaintiff a Halal meat diet is not the least restrictive means

13   to further those interests.  *See Warsoldier*, 418 F.3d at 1000.  For these reasons, the Court

14   finds that denying plaintiff a Halal meat diet is not the least restrictive means to further the

15   governmental interests cited by the DOC.

16   In an analogous case, in *Gonzales v. O Centro Espirita Beneficente União do Vegetal*,

17   — U. S. —, 126 S. Ct. 1211 (2006), the Supreme Court reaffirmed the significance of the

18   strict scrutiny analysis.  *O Centro* involved a claim under the Religious Freedom Restoration

19   Act (RFRA), a law that prohibits the federal government from substantially burdening a

20   person's exercise of religion unless the government "demonstrates that [the] application of the

21   burden to the person" represents the least restrictive means of advancing a compelling

22   interest.  42 U.S.C. § 2000bb-1(b).  A religious sect with origins in the Amazon rain forest

23   sought to import hallucinogens regulated under the Controlled Substances Act to be used in

24   communion rites.  The plaintiff sought declaratory and injunctive relief, and on appeal, the

25   Court affirmed the injunction directed against the government's attempts to bar the

26   importation and use of the sacramental substance.  The government broadly claimed it had

REPORT AND RECOMMENDATION
PAGE - 21

01  compelling governmental interests in enforcing the Controlled Substances Act, and that

02  judicial exemptions granted to sects such as the plaintiff would undermine the Act's

03  regulatory regime.  The Court held that under the more focused inquiry required by RFRA

04  and the compelling interest test, "the Government's mere invocation of the general

05  characteristics of Schedule I substances . . . cannot carry the day. . . .  Congress'

06  determination that DMT should be listed under Schedule I simply does not provide a

07  categorical answer that relieves the Government of the obligation to shoulder its burden under

08  RFRA."  *O Centro*, 126 S. Ct. at 1221.  Instead, the government was required to deal with the

09  burden in the specific context presented.

10      An identical burden must be met by the defendants here, for the compelling interest

11  test required under RLUIPA, like RFRA, is satisfied only when the "government

12  demonstrates that imposition of the burden *on that person*" represents "the least restrictive

13  means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000cc-1(a)

14  (emphasis added).

15      On the evidentiary record before it, this Court finds that denying plaintiff a Halal meat

16  diet substantially burdens the plaintiff's sincerely held religious beliefs, that doing so does not

17  further a compelling governmental interest, and that defendants have not established that

18  denying plaintiff a Halal meat diet is the least restrictive means of furthering any compelling

19  governmental interests.  Accordingly, this Court must find that the DOC Defendants have

20  violated plaintiff's rights under RLUIPA, unless other defenses asserted by the defendant

21  preclude such a finding.

22          D.      The Defendants Have Not Violated the Fourteenth Amendment

23      The plaintiff also claims that the policy of denying Halal meat diets to Muslim

24  prisoners while providing Kosher meat diets to Jewish inmates violates the Equal Protection

25  Clause of the Fourteenth Amendment.  Dkt. No. 43.  An inmate who believes in a minority

26  religion must be afforded a "reasonable opportunity of pursing his faith comparable to the

REPORT AND RECOMMENDATION
PAGE - 22

01  opportunity afforded fellow prisoners who adhere to conventional religious precepts." *Allen*

02  *v. Toombs,* 827 F.2d 563, 567 (9th Cir. 1987).

03          However, in order to state a claim for relief for a violation of the Equal Protection

04  Clause, the plaintiff must establish that the defendants acted with intentional discrimination

05  against the plaintiff or against a class of inmates that included the plaintiff. *Reese v. Jefferson*

06  *Sch. Dist. No. 14J,* 208 F.3d 736, 740 (9th Cir. 2000).  The plaintiff cannot do this.  Although

07  the plaintiff produced defendant e-mails that indicated that certain corrections officials

08  believed that they were required to supply Halal meat diets when they started serving Kosher

09  meat diets, the ultimate basis for the denial was the defendants' reliance upon earlier court

10  decisions.  Although this Court disagrees with those decisions, the plaintiff has produced no

11  evidence that would support a finding that the State or any of the defendants acted with the

12  requisite intent.  Whether they can continue in the future to deny requests for Halal meat on

13  this basis is not a question before this Court. Accordingly, summary judgment on this claim is

14  appropriate. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (nonmoving party's

15  failure of proof "renders all other facts immaterial," creating no genuine issue of fact and

16  entitling the moving party to the summary judgment it sought).

17          E.    RLUIPA Applies to the SCC Defendants

18          In a footnote, the SCC suggests that RLUIPA may not be applicable to it, because the

19  SCC is a state-funded program that does not receive federal funds.  Dkt. No. 71-1 at 12 n.8.

20  This matter is not seriously pressed in this motion, due undoubtedly to this Court's prior

21  decision on the issue. *See* Order Granting Plaintiff's Motion to Amend, Dkt. No. 42.  Briefly,

22  that Order held that given the broad definitions of both "government" and "programs and

23  activities" contained in RLUIPA, see 42 U.S.C. § 2000cc–5(6) and 1(b), the SCC is covered

24  by the requirements of RLUIPA because it is operated by the Washington Department of

25  Social and Health Services, which receives federal funds.  The constitutionality of this

26  expansive interpretation was affirmed in *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th

01    Cir. 2002).  The plaintiff also raised Commerce Clause arguments to support its position that

02    RLUIPA applied to the SCC.  However, in light of the Court's decision that the Spending

03    Clause power gave Congress the power to enact RLUIPA, it was not necessary to address the

04    Commerce Clause argument.  In any event, this Court reaffirms its earlier decision that the

05    SCC is subject to RLUIPA.[3]

06            F.      Because the Rights at Issue Were Not Clearly Established at the Time
                      of the Violation, the Defendants Are Entitled to Qualified Immunity
07                    from Monetary Damages

08            As discussed above, under the two-part test for qualified immunity analysis dictated

09    by the Court in *Saucier v. Katz*, the Court is to establish first, whether the defendants, acting

10    under color of state law, have violated rights established by the Constitution or by federal law.

11    *Saucier*, 533 U.S. at 201.  If a violation is established, then the Court must ascertain whether

12    the constitutional right at issue was "clearly established" at the time of the alleged violation.

13    *Id.*; *Cruz*, 279 F.3d at 1069.  In this case, the plaintiff has not established that these rights

14    were "clearly established" at the time of the violation.  Indeed, both defendants have relied

15    upon legal authority that runs contrary to this decision, including cases from both the Western

16    and Eastern Districts of Washington.  *See supra*, at 9.  Although none of these decisions have

17    been reported, and although they are all in cases in which the plaintiff inmate proceeded *pro*

18    *se*, they are evidence of the state of the law for purposes of determining whether the law is

19    clearly established.  *See Sorrels v. McKee*, 290 F.3d 965, 970 (9th Cir. 2002).  These cases

20    demonstrate that the interpretation of RLUIPA this Court believes is applicable to this

21    plaintiff was not clearly established at the time the requested diet was denied.  As a result, the

22    plaintiff is not entitled to monetary damages.

23            G       The Plaintiff is Not Entitled to Injunctive Relief Against the DOC
                      Defendants, But is Entitled to Declaratory Relief Against the SCC
24

25            [3]  Congress' power to enact RLUIPA was recently re-affirmed in *Guru Nanak Sikh v.*
26    *County of Sutter*, 456 F.3d 978, 994 (9th Cir. 2006).  *See also San Jose Christian Coll. v. City*
      *of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004) ("We have upheld RLUIPA as a
      constitutional exercise of Congress' spending power.").

REPORT AND RECOMMENDATION
PAGE - 24

01          Defendants

02          Although qualified immunity immunizes the DOC and SCC Defendants from

03   monetary liability, in this case, the plaintiff is also seeking declaratory and injunctive relief

04   against both defendants.  Qualified immunity does not bar the award of injunctive or

05   declaratory relief.  *Am. Fire, Theft & Collision Managers, Inc. v. Gillespie*, 932 F.2d 816, 818

06   (9th Cir. 1991).  However, the plaintiff is not entitled to injunctive relief against the DOC

07   Defendants.  A prisoner's release or transfer from a prison will moot any claims for injunctive

08   relief relating to the prison's policies unless the suit has been certified as a class action.

09   *Johnson v. Moore*, 948 F.2d 517, 519 (9th Cir. 1991).  The plaintiff was released from DOC

10   custody in May 2005.  Although this case was filed prior to his release, the case was not

11   certified as a class action, and the plaintiff is unlikely to be transferred back to the MCC.  As

12   a result, injunctive and declaratory relief against the DOC is unavailable.  The same is not

13   true as to the SCC Defendants.

14          The SCC Defendants have been providing the plaintiff with a Halal meat diet,

15   consistent with his religious requirements.  Generally, requirements for injunctive relief

16   require that the moving party show that he has sustained irreparable injury and has no

17   adequate remedy at law.  *See Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1138

18   n.11 (9th Cir. 2006).  In this case, the plaintiff has not shown that he has suffered irreparable

19   injury, because the SCC has decided, at least for the time being, to provide him with a Halal

20   meat diet.  As a result, injunctive relief is not appropriate.

21          However, the plaintiff has demonstrated that he is entitled to declaratory relief.  "The

22   Declaratory Judgment Act of 1934, 28 U.S.C. § 2201, permits a federal court to declare the

23   rights of a party whether or not further relief is or could be sought, and . . . under this Act[,]

24   declaratory relief may be available even though an injunction is not."  *Green v. Mansour*, 474

25   U.S. 64, 72 (1985); *see* 28 U.S.C. § 2201(a) ("In a case of actual controversy within its

26   jurisdiction . . . any court of the United States . . . may declare the rights and other legal

REPORT AND RECOMMENDATION
PAGE - 25

01   relations of any interested party seeking such declaration.").  To establish standing under the

02   Act, a plaintiff must present the existence of a substantial controversy, between parties having

03   adverse interests, of sufficient immediacy and reality to warrant issuance of a declaratory

04   judgment.  *Scott v. Pasadena Unified School Dist.*, 306 F.3d 646, 658 (9th Cir. 2002).  In the

05   present case, all three elements unquestionably exist.  Accordingly, the plaintiff is entitled to a

06   declaration that under RLUIPA, he is entitled to a religiously appropriate diet that includes

07   Halal meat.  He has established his entitlement to this diet in this lawsuit, and the SCC

08   Defendants consistently deny that they have any such obligation.

09          H.      The Eleventh Amendment Does Not Bar Declaratory Relief

10                  1.     *Background*

11          The SCC claims that the Eleventh Amendment bars all forms of injunctive and

12   declaratory relief in this case.  Dkt. No. 71 at 16.  The Court has already ruled that injunctive

13   relief is unavailable.  Nevertheless, because a similar sovereign immunity framework applies to

14   both injunctive and declaratory relief actions brought under § 1983, a brief review of the

15   former remedy is necessary to analyze the propriety of the latter, more modern and "milder

16   alternative." *Perez v. Ledesma*, 401 U.S. 82 (1971).

17          The Eleventh Amendment and state sovereign immunity generally bar federal courts

18   from entertaining suits brought by private parties against a state or its instrumentality absent

19   consent, waiver or congressional abrogation.  *See generally College Sav. Bank v. Florida*

20   *Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 669-70 (1999).[4]  In *Quern v.*

21   *Jordan*, 440 U.S. 332, 339-40 (1979), the Supreme Court held that Congress did not abrogate

22   the states' sovereign immunity by enacting § 1983, and that a state, state agencies, or state

---

24          [4] While the SCC has used the term "Eleventh Amendment Sovereign Immunity"
     throughout its filings in this case, it is important to note that this phrase, while a convenient

25   shorthand, is somewhat of a misnomer, as state sovereign immunity neither derives from nor
     is limited by the terms of the Eleventh Amendment.  *Alden v. Maine*, 527 U.S. 706, 713

26   (1999); *Stanley v. Trustees of California State Univ.*, 433 F.3d 1129, 1133 (9th Cir. 2006);
     THE FEDERALIST NO. 81, at 548-49 (Alexander Hamilton) (Jacob E. Cooke ed., 1961).

REPORT AND RECOMMENDATION
PAGE - 26

01  officials acting in their official capacities are not "persons" amenable to suit under § 1983.  *See*

02  *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64 (1989).

03       However, *Will* explicitly reconfirmed a century-old exception to this rule.  In 1908, the

04  Supreme Court in *Ex parte Young* held that a federal court could enjoin a state officer to

05  conform his future behavior to federal law.  *Ex parte Young*, 209 U.S. 123, 159-60 (1908); *see*

06  *also Will*, 491 U.S. at 71 n.10 (noting that the Court's holding did not disturb the *Ex parte Young*

07  exception).[5]  Six decades later, in *Edelman v. Jordan*, 415 U.S. 651 (1974), the Supreme Court

08  clarified the scope of *Ex Parte Young*'s exception by holding that a federal court may award

09  prospective injunctive relief that governs an official's future conduct, but may not award

10  retroactive relief that requires the payment of funds from the state treasury.  *Id.* at 663-69.

11  Indeed, injunctive relief against a state official is deemed prospective, and thus permissible, despite

12  the possibility that such an award might have an ancillary fiscal impact on state coffers.  *See*

13  *Milliken v. Bradley*, 433 U.S. 267, 289 (1977) (holding that a prospectively oriented injunction

14  could have a "direct and substantial impact" on the state treasury without running afoul of the

15  prospective–retrospective dividing line enunciated in *Edelman*).

16       In sum, the individual SCC defendant's sovereign immunity argument lacks merit.  The

17  Eleventh Amendment, standing alone, does not bar prospective injunctive relief against state

18  officers in their official capacity.  *Accord Los Angeles Bar Assoc. v. Eu*, 979 F.2d 697, 704 (9th

19  Cir. 1992).  Were injunctive relief otherwise available in this case, it would look to the state

20  officers' actions in the future, not to the restitution due the plaintiff for the state's malfeasance in

21  the past.  Because such relief is positioned firmly on the prospective side of the *Edelman* divide, it

22  remains unaffected by the Eleventh Amendment.  However, because such relief has been found

23

24  _____

25       [5]  The so-called "legal fiction" of *Ex parte Young* created an exception to sovereign
    immunity by holding that a state official who acts in violation of federal law is "stripped of his

26  official or representative character[,]" thereby foreclosing the protections afforded by
    sovereign immunity, and thereafter re-cloaked with the mantle of the State in order to meet
    the state action requirement of the Fourteenth Amendment.  *Ex parte Young*, 209 U.S. at 160.

REPORT AND RECOMMENDATION
PAGE - 27

01    unavailable for independent reasons, the Court proceeds to plaintiff's claim for declaratory relief.

02

03                  2.      *The Eleventh Amendment Does Not Bar Declaratory Relief*

04        The Eleventh Amendment erects no bar to declaratory relief in this case. *Ex parte*

05 *Young* was decided before declaratory relief became available in the federal courts. *See Steffel*

06 *v. Thompson*, 415 U.S. 452, 466-67 (1974) (noting that the 1934 Declaratory Judgment Act

07 was passed "to provide a milder alternative to the injunction remedy"). However, the Ninth

08 Circuit has "long held that the Eleventh Amendment does not generally bar declaratory

09 judgment actions against state officers." *National Audubon Soc'y, Inc. v. Davis*, 307 F.3d

10 835, 847-48 (9th Cir. 2002) (citing *Agua Caliente Band of Cahuilla Indians v. Hardin*, 223 F.3d

11 1041 (9th Cir. 2000) (applying *Ex parte Young* exception to declaratory relief against state board

12 of equalization); *Eu*, 979 F.2d at 704 (holding that "the Eleventh Amendment presents no barrier to

13 the Bar Association's request for declaratory relief against an alleged ongoing violation of federal

14 law"); *see also Wilbur v. Locke*, 423 F.3d 1101, 1111 (9th Cir. 2005) (holding that "the Eleventh

15 Amendment does not bar [plaintiffs'] claims for declaratory and injunctive relief against the

16 Governor and the Director and Assistant Director of the Department of Revenue"); *Wolfe v.*

17 *Strankman*, 392 F.3d 358, 365 (9th Cir. 2004) (similar).

18        Instead, the issue is whether the declaratory action seeks prospective, rather than

19 retrospective, relief. *Locke*, 423 F.3d at 1111 ("[I]n determining whether the doctrine of *Ex Parte*

20 *Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward

21 inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief

22 properly characterized as prospective." (quoting *ACS of Fairbanks, Inc. v. GCI Commc'n Corp.*,

23 321 F.3d 1215, 1216-17 (9th Cir. 2003))); *see also Eu*, 979 F.2d at 704 ("[T]he Eleventh

24 Amendment does not bar action seeking only prospective declaratory *or* injunctive relief against

25 state officers in their official capacities.") (emphasis added). In this case, far from being a

26 retrospective reward, a declaration that plaintiff is entitled to receive Halal meat under RLUIPA, by

REPORT AND RECOMMENDATION
PAGE - 28

01  its very nature, accommodates plaintiff's federally-protected religious diet in the future; it does not

02  fill his stomach or wallet for the past.   Such relief does not constitute "an 'end run' around . . .

03  *Edelman v. Jordan*," but rather, has a purely prospective effect.  *Davis*, 307 F.3d at 847-48.

04  Because the relief is "truly prospective in nature," the *Ex Parte Young* exception to Eleventh

05  Amendment immunity applies.  *Id.* at 848.

06        The SCC also contends that because no "continuing violation of federal law" exists, the

07  Eleventh Amendment nevertheless stands as an insuperable bar to declaratory relief.  Dkt. No. 71 at

08  18.  This position, in effect, inserts an additional Article III standing requirement for all § 1983

09  actions brought under the *Ex parte Young* exception.

10        First, as stated above, this suit is not moot.  *See supra*, at 4-5; *Ballen*, — F.3d — , 2006

11  WL 2640537, at *2; *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000) ("Voluntary

12  cessation of challenged conduct moots a case, however, only if it is 'absolutely clear that the

13  allegedly wrongful behavior could not reasonably be expected to recur.'" (quoting *United States v.*

14  *Concentrated Phosphate Export Assn., Inc.*, 393 U.S. 199, 203 (1968)).  Second, and more

15  importantly, this jurisdictional hurdle need not be climbed twice merely because the plaintiff seeks

16  declaratory relief.  In no uncertain terms, the Ninth Circuit has "decline[d] to read additional

17  'ripeness' or 'imminence' requirements into the *Ex parte Young* exception to Eleventh Amendment

18  immunity in actions for declaratory relief beyond those already imposed by a general Article III"

19  and prudential justiciability requirements.  *Davis*, 307 F.3d at 847.   Accordingly, no bar exists to

20  declaratory relief.

21       I.    <u>The Plaintiff is Entitled to Attorneys' Fees and Costs</u>

22        As the recipient and direct beneficiary of a declaratory judgment in this matter,

23  plaintiff is a "prevailing party" entitled to attorneys' fees and costs under the Civil Rights

24  Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988(b).  *Cummings v. Connell*, 402 F.3d

25  936, 946 (9th Cir. 2005).

26                       IV.  CONCLUSION

REPORT AND RECOMMENDATION
PAGE - 29

01          The Court is not unsympathetic to the varying demands placed on those responsible

02  for running and administering penal institutions and institutions such as the SCC.

03  Nevertheless, Congress enacted RLUIPA with the thought that breaking down "frivolous or

04  arbitrary" barriers to inmates' practice of religion could be an effective tool to help inmates

05  "get back on track," and concluded that inconvenience in accommodating those religious

06  beliefs was a small price to pay for these benefits.  One of the identified "frivolous or

07  arbitrary" practices cited was the denial of Halal diets to Muslim inmates while providing

08  Kosher diets to Jewish inmates.  To ensure that the law was effective, Congress directed that

09  any impairment of an inmates' sincerely held religious beliefs be subjected to a strict scrutiny

10  standard of review.

11          In this case, religious scholars differ on whether Islam requires that adherents consume

12  Halal meat as part of an approved Halal diet.  However, there is no dispute regarding the

13  sincerity of plaintiff's beliefs that his religion requires him to maintain a Halal meat diet.

14  Moreover, this belief is supported by religious scholars, even as it is challenged by other

15  religious scholars.  It is not the role of this Court to act as an arbiter of what is and what is not

16  required by faithful Muslims.  Having established a prima facie case for relief under

17  RLUIPA, the burden then shifts to the defendants to demonstrate that there are compelling

18  reasons to deny the plaintiff a Halal meat diet, and to demonstrate that denial of a Halal meat

19  diet is the least restrictive means necessary to achieve those purposes.       The defendants

20  failed to meet this burden.

21          Accordingly, this Court recommends that the Plaintiff's Motion for Summary

22  Judgment (Dkt. No. 81) be GRANTED as to the declaratory relief sought against the SCC

23  Defendants, establishing that plaintiff has a right under RLUIPA to receive a Halal meat diet.

24  While plaintiff has established a right to receive the religious diet in question, because this

25  right was not clearly established at the time that the DOC Defendants denied his dietary

26  request and prior to the time that SCC began to comply with his request, the defendants are

REPORT AND RECOMMENDATION
PAGE - 30

01 entitled to qualified immunity as to the plaintiff's monetary requests.  As a result, the

02 Defendants' Motions for Summary Judgment (Dkt. Nos. 70 and 71) should be GRANTED as

03 to the request for monetary and injunctive relief.  A proposed order accompanies this Report

04 and Recommendation.

05

06        DATED this 2nd day of October, 2006.

07

08                                                    *James P. Donohue*

09                                              JAMES P. DONOHUE
                                               United States Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

REPORT AND RECOMMENDATION
PAGE - 31